UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MELODY BORDEAUX,                )
                                )
                Plaintiff,      )
                                )
        v.                      )    No.  4:11CV876 FRB
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security, )
                                )
                Defendant.      )

## MEMORANDUM AND ORDER

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.   All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

        On February 7, 2008, plaintiff Melody Bordeaux filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an
application for Supplemental Security Income pursuant to Title XVI
of the Act, 42 U.S.C. §§ 1381, et seq., in which she alleged that
she became disabled on July 1, 2006.   (Tr. 136-38, 139-41.)
Plaintiff subsequently amended her onset date to December 13, 2007.
(Tr. 31, 158.)   On initial consideration, the Social Security
Administration denied plaintiff's claims for benefits.   (Tr. 73-
77.)  On October 20, 2009, upon plaintiff's request, a hearing was
held before an Administrative Law Judge (ALJ).   (Tr. 27-66.)

Plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. On November 9, 2009, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 12-22.) On April 11, 2011, upon consideration of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on October 20, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-four years of age. Plaintiff stands five feet, two inches tall and weighs 225 pounds. (Tr. 33-34.) Plaintiff is single and lives in a house with her adult son and ninety-two-year-old mother. (Tr. 32-33.) Plaintiff attended college for two years. (Tr. 33-34.) Plaintiff can read and write and can perform simple arithmetic. (Tr. 34-35.) Plaintiff receives food stamps. (Tr. 36.)

Plaintiff's Work History Report shows plaintiff to have worked for MasterCard as a member services representative from June 1986 to January 1996. Plaintiff worked as an activity leader for an apartment complex from January 1996 to November 1996. From November 1996 to April 1997, and again from November 1999 to June 2004, plaintiff worked as a recruiter for jobs programs. From

September 2007 to December 2007, plaintiff worked as a church secretary. (Tr. 191.) Plaintiff testified that she left this job because a new priest to the parish brought his own staff, and there was no position remaining for her. (Tr. 37.)

Plaintiff testified that her ability to work is affected by numbness and burning sensations on the entire left side of her body. Plaintiff testified that the sensation begins at her waist and travels down to her toes. Plaintiff testified that she experiences discomfort in her leg when she sits, and that she has fallen in the past upon standing after her leg has become numb. (Tr. 45, 48.) Plaintiff testified that a chiropractor advised her that she had a degenerative disc. Plaintiff testified that a CT scan showed mild arthritic changes in the back and that an MRI showed a mid-line bulge. Plaintiff testified that she has not seen an orthopedic doctor, has not had back surgery, nor has participated in physical therapy. Plaintiff testified that she takes Flexeril for muscle spasms and Ultram for pain. (Tr. 46-48.)

Plaintiff testified that she experiences pain with dressing and that the pain is becoming worse. Plaintiff testified that she has difficulty with extension and reaching in that she sometimes drops things with her left hand and loses balance if she has to reach with her right hand. Plaintiff testified that she is no longer centered with her balance and thinks that it may be due to weakness. Plaintiff testified that she began experiencing such weakness about one year prior. Plaintiff testified that her left

- 3 -

arm and hand go to sleep and tingle and that no particular activity or position brings on the sensation.  Plaintiff testified that she must use an irregular motion with her left arm in order to comfortably engage in activities.  (Tr. 54-56.)

Plaintiff testified that she also has a cardiac condition whereby her heart races at times and she becomes extremely fatigued.  Plaintiff testified that she experiences dizziness with these episodes and that such dizziness is accompanied by nausea and blurred vision.  Plaintiff testified that such episodes last up to three days and that she lies down and tries to stay comfortable during such time.  Plaintiff testified that she lies down ten to twelve hours a day in addition to the time she sleeps.  Plaintiff testified that she feels "peppy" for only one or two days during the course of a week.  (Tr. 56-59.)

Plaintiff testified that she takes medication for heart arrhythmia.  Plaintiff testified that her medications also include Celebrex and Lipitor and that she sometimes experiences dizziness and fatigue as side effects.  (Tr. 48-49.)

Plaintiff testified that she used to walk for thirty minutes, four days a week but that she can now walk only fifteen to twenty minutes.  Plaintiff testified that she can stand for five to ten minutes before she must change positions.  Plaintiff testified that she can sit for ten minutes.  Plaintiff testified that she can lift seven to ten pounds.  (Tr. 52-53.)

As to her daily activities, plaintiff testified that she

- 4 -

has a driver's license and drives but does not trust her ability because of blurred vision which causes her to misjudge distance. (Tr. 59.)  Plaintiff testified that she is able to cook, but does not do so often.  (Tr. 49.)  Plaintiff testified that her son performs housework such as doing dishes and laundry, and also does the yard work.  Plaintiff testified that she is able to go grocery shopping but seldom does so.  Plaintiff testified that she does not carry the groceries when she gets home but rather leaves them in the car.  Plaintiff testified that a home health care provider cares for her elderly mother five hours a day, five days a week and has done so for nearly four years.  Plaintiff testified that she cared for her mother herself before that time.  (Tr. 50-52.)

B.   Testimony of Vocational Expert

        Delores Gonzales, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

        Ms. Gonzales classified plaintiff's past relevant work as an activity leader, trainer and job coach as light and semi-skilled; as an enumerator as light and unskilled; as a customer service representative, secretary and receptionist as sedentary and semi-skilled; and as a recruiter as sedentary and skilled.  (Tr. 62.)

        The ALJ asked the vocational expert to assume an individual of plaintiff's age, education, training, and work experience, and to further assume that "the individual can perform light work with the following exceptions.  She can climb stairs and

- 5 -

ramps occasionally, never climb ropes, ladders and scaffolds.  Can balance, stoop, kneel and crouch occasionally."  (Tr. 63.)  Ms. Gonzales testified that such a person could perform all of plaintiff's past work.  (Tr. 63.)

The ALJ then asked Ms. Gonzales to assume the same individual, but that the person could only frequently reach in all directions.  Ms. Gonzales testified that such a person could perform all of plaintiff's past work.  (Tr. 63-64.)

The ALJ then asked Ms. Gonzales to assume the same individual as described in the second hypothetical, but that the person

> would be limited to walking to only 20 minutes at a time, standing 10 minutes at a time, sitting 10 minutes at a time, lifting no more than 10 pounds, and this individual would also have up to three days a month that she would not be able to work because of dizziness, blurred vision, she would just not be able to work so up to three absences per month. [sic]

(Tr. 64.)

Ms. Gonzales testified that such a person could not perform any of plaintiff's past relevant work and would be precluded from performing any competitive employment.  (Tr. 64.)

- 6 -

### III.  Medical Records[1]

Between February 9, 2001, and March 28, 2001, plaintiff
visited Esquire Sports Medicine & Rehabilitation (Esquire Rehab) on
sixteen occasions for treatment relating to pain sustained as a
result of a motor vehicle accident.  Plaintiff complained of
headaches and pain in her upper back, low back, neck, left hip, and
left leg with decreased range of motion.  Plaintiff also complained
of tingling in her left arm and left leg.  Plaintiff's condition
improved throughout the course of treatment and, by March 21, 2001,
plaintiff was instructed to engage in normal activity with no

---

[1]In its Notice of Action, the Appeals Council informed
plaintiff that, in making its determination to deny review of the
ALJ's decision, it had considered additional evidence which was not
before the ALJ.  (Tr. 1-4.)   The Court must consider this
additional evidence in determining whether the ALJ's decision was
supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935,
939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th
Cir. 1994).   Here, the Appeals Council specifically informed
plaintiff that it considered evidence designated as Exhibits 14F
and 15F in the administrative file and described such exhibits as
containing records from Esquire Sports Medicine dated July 20
through October 9, 2009; and from Advanced Pain Control dated July
21, 2010, through January 25, 2011.  (See Tr. 4.)  A review of the
administrative file shows, however, that Exhibit 15F also contains
medical records from People's Health Centers dated January 6, 2010.
(See Tr. 648-52.)  Inasmuch as the Appeals Council stated that it
considered the evidence contained in Exhibit 15F, and records from
People's Health Centers are contained in such exhibit, it is
reasonable to conclude that the Appeals Council considered the
records from People's Health Centers despite its failure to
specifically identify them as additional evidence.  For the sake of
continuity in this memorandum, the Court incorporates discussion of
these records, as well as of the additional records from Esquire
Sports Medicine and Advanced Pain Control, with that relating to
the evidence which was before the ALJ at the time of his decision.

restrictions.  (Tr. 404-07.)[2]

Plaintiff returned to Esquire Rehab in April and May 2001 with complaints of stiffness about the neck and upper back as well as intermittent soreness about the hip.  Treatment improved plaintiff's tenderness and spasms.  In December 2001, plaintiff received treatment for pain about the left hip and low back, and improvement was noted.  (Tr. 408-09.)

From January 2002 through March 2004, plaintiff visited Esquire Rehab on seventy-two separate occasions for treatment relating to complaints of low back pain, hip pain, intermittent leg pain, and achiness in the right forearm.  It was repeatedly noted throughout this period that plaintiff was working long hours. Tenderness, muscle spasm, and decreased range of motion were noted throughout this period, but it was also noted that plaintiff's conditions improved with treatment.  (Tr. 409-23.)

On April 23, 2004, plaintiff visited Esquire Rehab and complained of soreness and stiffness about the low back with achiness in the right hip.  Range of motion was noted to be restricted.  Strength and deep tendon reflexes were noted to be within normal limits.  Spasms were noted about the lumbosacral spine.  Plaintiff was instructed to continue with her home care exercises.  (Tr. 424.)

---

[2]The record is unclear as to whether the treatment provided by Esquire Rehab was in the form of chiropractic treatment or physical therapy.  For ease of reference, the Court will refer generally to plaintiff's treatment at Esquire Rehab as "treatment."

On May 27, 2004, plaintiff visited Chapel Chiropractic Orthopedics and complained of having had pain in her back and left leg for over a year. Plaintiff reported her current medications to include Celebrex.[3] Upon examination, plaintiff was diagnosed with lumbar disc irritation and sacroiliac joint strain. (Tr. 260-64.)

Plaintiff returned to Chapel Chiropractic on June 4, 2004, and complained of an exacerbation of pain. Plaintiff underwent a manipulation at the lumbosacral level. It was recommended that plaintiff undergo two additional sessions the following week. Plaintiff's last reported visit to Chapel Chiropractic occurred on June 21, 2004, for additional manipulation. (Tr. 265-66.)

On September 11, 2004, plaintiff returned to Esquire Rehab and complained of soreness and stiffness about the low back but reported that she was doing pretty well. Active range of motion was within normal limits with mild discomfort. Passive range of motion showed some restriction about the thoracic-sacral spine. Plaintiff was instructed to return as needed. (Tr. 424.)

Plaintiff visited Dr. Carmel Boykin-Wright at Euclid Primary Care on December 1, 2004, with complaints of chest discomfort. Plaintiff reported having recent stress in her

---

[3]Celebrex is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Medline Plus (last revised Aug. 15, 2012) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

personal life.  Plaintiff was prescribed Verapamil.[4]  (Tr. 440.)

Dr. Boykin-Wright called in a refill prescription of Verapamil on March 4, 2005.  On March 17, 2005, plaintiff failed to appear for a scheduled appointment with Dr. Boykin-Wright.  (Tr. 440.)

Plaintiff returned to Esquire Rehab on May 15, 2005, and reported having "pulled" her low back on the left side while bending over to move a rug.  Tenderness, decreased range of motion, and spasms were noted.  Plaintiff was instructed to apply ice and heat to the affected area and was encouraged to walk.  (Tr. 425.)

Dr. Boykin-Wright prescribed Celebrex for plaintiff on September 8, 2005.  (Tr. 523.)

Plaintiff was admitted to the emergency room at St. Mary's Health Center on September 30, 2005, with complaints of swelling, redness, and pain in the right arm and in the area of the right lateral neck.  Plaintiff's past medical history was noted to include atrial fibrillation and arthritis of the left hip. (Tr. 520.)  An x-ray of plaintiff's right forearm was unremarkable. (Tr. 452.)  Plaintiff was diagnosed with right forearm tendinitis and was given Vicodin.[5]  Plaintiff was discharged that same date in

---

[4]Verapamil (Calan) is used to treat high blood pressure, control chest pain, and prevent and treat irregular heartbeats. Medline Plus (last reviewed Aug. 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684030.html>.

[5]Vicodin is used to relieve moderate to severe pain.  Medline Plus (last revised July 18, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601006.html>.

- 10 -

stable condition.  (Tr. 520.)

From August 2005 through January 2006, plaintiff visited Esquire Rehab on ten occasions with complaints relating to soreness and stiffness about the low back and neck.  Decreased range of motion was noted throughout this period, as well as tenderness and paraspinal muscle spasms.  Plaintiff tolerated the treatment well and was instructed to continue with home exercises and water therapy.  (Tr. 425-27.)

On January 9, 2006, Dr. Boykin-Wright prescribed Celebrex for plaintiff.  (Tr. 513.)  On February 8, 2006, plaintiff failed to appear for a scheduled appointment with Dr. Boykin-Wright.  (Tr. 439.)

Plaintiff visited Dr. Jean Thomas, a gynecologist, on February 27, 2006, and complained of severe pelvic pain. Plaintiff's history of lumbar problems was noted.  A pelvic ultrasound was ordered and Darvocet[6] was prescribed.  (Tr. 274.)

Plaintiff visited Dr. Thomas on March 13, 2006, and continued to complain of severe pelvic pain.  Dr. Thomas noted plaintiff to have low pain tolerance.  (Tr. 270.)

A cardio-pulmonary function test dated April 4, 2006, showed normal sinus rhythm but left atrial abnormality.  (Tr. 329, 448.)  A chest x-ray taken that same date was negative.  (Tr. 449.)

From March 2006 through June 2006, plaintiff visited

---

[6]Darvocet is used to relieve mild to moderate pain.  Medline Plus (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

Esquire Rehab on seven occasions relating to her complaints of mid to low back pain.  Tenderness and restricted range of motion were noted throughout this period, but plaintiff demonstrated improvement and good mobility with treatment.  (Tr. 427-28.)

On May 5, 2006, Dr. Boykin-Wright prescribed Celebrex for plaintiff.  (Tr. 499.)  Dr. Boykin-Wright prescribed Verapamil for plaintiff on May 30 and June 12, 2006.  (Tr. 500, 439.)  On July 20, 2006, plaintiff failed to appear for a scheduled appointment with Dr. Boykin-Wright.  (Tr. 439.)

On August 25, 2006, plaintiff complained to Dr. Thomas of having pain in the left lower quadrant and that the pelvic area was very painful.  Darvocet was prescribed.  (Tr. 271.)  On September 19, 2006, plaintiff underwent a hysterectomy in response to her complaints of severe abdominal pain, severe pelvic pain, and severe back pain.  It was noted that plaintiff had been taking Darvocet and ibuprofen.  Plaintiff was discharged on September 20, 2006, and was prescribed Percocet[7] and Motrin upon discharge.  (Tr. 304-28.) Plaintiff visited Dr. Thomas on September 28, 2006, and her prescription for Darvocet was refilled.  Ibuprofen was also prescribed.  (Tr. 272.)

On October 18, 2006, plaintiff visited Dr. Boykin-Wright for follow up of supraventricular tachycardia, hyperlipidemia, and allergic rhinitis.  Plaintiff reported feeling fine.  Plaintiff

---

[7]Percocet is used to relieve moderate to severe pain.  Medline Plus (last revised Oct. 15, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682132.html>.

reported that she continued to provide care for her chronically ill and disabled mother.  Plaintiff complained of fleeting left-sided sharp chest and neck pain, usually resolving spontaneously after a few seconds.  Dr. Boykin-Wright noted plaintiff to weigh 206 pounds.  Physical examination was unremarkable.  Dr. Boykin-Wright diagnosed plaintiff with supraventricular tachycardia, controlled, and instructed plaintiff to continue with Verapamil.  Laboratory testing was ordered.  Plaintiff was also instructed to continue with her medication for hyperlipidemia.  (Tr. 442.)

Plaintiff returned to Esquire Rehab on January 20, 2007, and complained of mid to low back pain.  Plaintiff reported that she felt improvement overall.  Mild lumbar discomfort was noted. Tenderness was noted about the sacroiliac on the left.  Plaintiff had decreased range of motion, but it was noted to have improved. Plaintiff tolerated the treatment well and was instructed to return as needed.  (Tr. 428.)

On January 21, 2007, plaintiff visited Dr. Boykin-Wright with complaints of left hip pain.  (Tr. 439.)

Plaintiff visited Esquire Rehab on two occasions in March 2007 and complained of mid to low back pain with stiffness. Plaintiff also complained of aching in the left hip.  Tenderness was noted about the left sacroiliac.  It was noted that plaintiff began her exercise program again and demonstrated good mobility. Plaintiff tolerated the treatment sessions well and was instructed to return as needed.  (Tr. 428-29.)

- 13 -

Plaintiff returned to Esquire Rehab on May 25, 2007, with complaints of soreness and stiffness about the low back.  Moderate tenderness was noted.  Plaintiff tolerated the treatment well and was instructed to continue treatment as needed.  (Tr. 429.)

On July 27, 2007, Dr. Boykin-Wright prescribed Verapamil for plaintiff.  (Tr. 439.)

Plaintiff visited Dr. Boykin-Wright on July 30, 2007, for follow up of supraventricular tachycardia, allergic rhinitis, and hyperlipidemia.  Plaintiff reported feeling relatively well except for an occasional episode of low back pain.  Plaintiff reported that she recently fell "causing a brief injury to her back." Plaintiff also reported that she occasionally experienced back pain "after repeatedly lifting in assisting her mother throughout the day."  Plaintiff reported having no numbness or tingling in her lower extremities.  Plaintiff reported having no dizziness, headaches, chest pain, or lower extremity edema.  Plaintiff reported that she had been unable to exercise regularly because of the amount of time it took for her to care for her disabled mother. Dr. Boykin-Wright noted plaintiff to weigh 226 pounds.  Physical examination was unremarkable.  Dr. Boykin-Wright diagnosed plaintiff with supraventricular tachycardia, stable, and instructed plaintiff to continue with Verapamil.  Dr. Boykin-Wright also instructed plaintiff to continue with her other medications for hyperlipidemia and allergic rhinitis.  (Tr. 441.)

Plaintiff visited Dr. Boykin-Wright on November 5, 2007,

- 14 -

for administration of an influenza vaccine.  No complaints were noted.  (Tr. 439.)

Plaintiff's prescription for Calan was refilled on November 14 and 27, 2007.  (Tr. 463, 464.)

On January 12, 2008, plaintiff visited Esquire Rehab with complaints of low back pain radiating to the left leg and foot and into the toes.  Plaintiff reported that she had trouble sitting on account of the pain.  Plaintiff was noted to have decreased active range of motion with +1/4 deep tendon reflexes.  No atrophy or weakness was noted.  Plaintiff tolerated the treatment well. Plaintiff was instructed to walk, apply ice to the affected area, and to follow up with a specialist.  (Tr. 429.)

On April 17, 2008, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff's chief complaints were noted to include pain in the back, legs, and buttocks; dizziness; and muscle spasms.  Plaintiff also complained of problems with the left side of her body "going to sleep" and that she was not sleeping well due to pain. Plaintiff reported feeling depressed due to her problems with pain. Plaintiff reported her current medications to include Calan, aspirin, Celebrex, ibuprofen, and a muscle relaxant but that she was not being treated for any medical condition.  Upon conclusion of the evaluation, plaintiff was diagnosed with depressive disorder, not otherwise specified, and was assigned a Global

Assessment of Functioning (GAF) score of 70.[8]  (Tr. 545-49.)

On April 17, 2008, plaintiff underwent a consultative physical examination for disability determinations.  Plaintiff's chief complaint was noted to be low back pain.  Plaintiff reported that her left leg began to feel "funny" in November 2007 and gave way which caused her to fall into a wall.  Plaintiff reported that treatment with muscle relaxants, ice, and anti-inflammatory medication helped but that she began to experience left foot numbness and a sense that her toes were curling.  Plaintiff currently complained of pain in her left leg and toes with radiation to the mid to low back.  Plaintiff reported experiencing numbness in the left leg from her hip to her toes and that she also had spasms in the region.  Plaintiff reported seeing a chiropractor in October 2007 and having last seen her physician in June 2007.  Plaintiff reported no other complaints.  Dr. Inna Park noted plaintiff's past medical history to include hypertension and unspecified arrhythmia.  Plaintiff appeared to be in no apparent distress.  Examination of the back showed lumbar spinal tenderness, as well as paraspinal muscle and gluteal spasms.  Plaintiff was noted to have an antalgic gait with normal station.  Plaintiff was

_____

[8]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  Id.

unable to walk on her toes and heels due to pain.  Plaintiff could squat to ten percent.  Examination of the hip and lumbar spine was restricted due to severe low back pain.  Plaintiff had limited range of motion about the lumbar spine.  Straight leg raising on the left was positive with extreme pain.  Neurological examination showed deep tendon reflexes to be decreased in the lower extremities with decreased strength in the left leg.  Grip strength and upper extremity strength was normal.  Upon conclusion of the examination, Dr. Park diagnosed plaintiff with low back pain with radicular symptoms and straight leg on the left, suspicious for disc disease.  X-rays of the lumbar spine taken that same date showed narrowing and sclerosis at the L-5, S-1 intervertebral disc space.  (Tr. 552-57.)

On May 1, 2008, Nancy Dunlap, a medical consultant for disability determinations, completed a Physical Residual Functional Capacity (RFC) Assessment upon review of records from Esquire Rehab dated January 2007, from plaintiff's treating physician dated July 2007, and from the consultative examination.  In the assessment, Ms. Dunlap opined that plaintiff could occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was limited in her ability to push and/or pull with her lower extremities.  Ms. Dunlap opined that plaintiff's degenerative disc disease limited her to occasional climbing, balancing, stooping, and crouching, but that

plaintiff could frequently kneel and crawl.  Ms. Dunlap opined that plaintiff had no manipulative, visual, communicative, or environmental limitations.  (Tr. 558-62.)

In a Psychiatric Review Technique Form completed May 2, 2008, Kyle DeVore, a psychological consultant for disability determinations, opined that plaintiff did not have a severe mental impairment.  (Tr. 563-73.)

Plaintiff visited Dr. Boykin-Wright on July 16, 2008, and reported having some problems with low back pain and stiffness in the left hip associated with weight gain during the previous few months.  Plaintiff reported being able to exercise, however, with minimal pain and difficulty.  Plaintiff reported plans to begin a more rigorous exercise program.  Plaintiff denied having headaches, dizziness, shortness of breath, or chest pain.  Plaintiff reported that she took Flexeril[9] at bedtime for painful muscle spasms in her back.  Physical examination was unremarkable.  Dr. Boykin-Wright diagnosed plaintiff with supraventricular tachycardia, stable, and instructed plaintiff to continue with Verapamil.  (Tr. 579.)

In a letter dated July 16, 2008, to "To Whom it May Concern," Dr. Boykin-Wright wrote that she had advised plaintiff to participate in the Fit For Life program at the YMCA in order to decrease her risks for further heart disease.  Dr. Boykin-Wright

---

[9]Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Medline Plus (last revised Oct. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

requested that plaintiff be permitted to participate in any available activities within the program.  (Tr. 591.)

Plaintiff's prescriptions for Celebrex and Calan were refilled on October 7, 2008.  (Tr. 578.)

Plaintiff visited Dr. Boykin-Wright on March 31, 2009, for follow up of supraventricular tachycardia, allergic rhinitis, and hyperlipidemia.  Plaintiff reported that she felt fine and had no major complaints.  Plaintiff reported that she had been engaging in more regular exercise to help with arthritis pain in her low back and hip area.  Plaintiff denied any headaches, dizziness, chest pains, or shortness of breath.  Physical examination was essentially unremarkable.  Dr. Boykin-Wright continued in her diagnosis of supraventricular tachycardia, noting it to be stable and asymptomatic.  Plaintiff was instructed to continue with Verapamil.  (Tr. 577.)

Plaintiff was admitted to the emergency room at St. John's Mercy Medical Center on July 16, 2009, after being involved in a motor vehicle accident.  Plaintiff complained of chest discomfort, left shoulder pain, low back pain, and left hip tenderness.  Plaintiff rated her pain at a level six.  A CT scan of the head was unremarkable.  A CT scan of the cervical spine showed mild arthritic changes at the C5-C6 and C6-C7 levels, but no fracture or dislocation was noted.  Plaintiff was discharged that

same date in stable condition and was prescribed Naprosyn[10] and Soma[11] upon discharge.  (Tr. 607-25.)

From July 20 to October 9, 2009, plaintiff visited Esquire Sports Medicine on twenty-three separate occasions for treatment and manipulation in relation to complaints of body aches and stiffness experienced as a result of the accident. Considerable improvement, but with impaired range of motion and mild tenderness, was noted upon the conclusion of these sessions. (Tr. 630-45.)

Plaintiff visited People's Health Centers on January 6, 2010, with complaints of back pain and insomnia.  Plaintiff reported having low back pain radiating to the left thigh and calf with a sensation of heaviness in the legs.  Plaintiff also reported experiencing numbness in the toes.  Plaintiff reported experiencing the pain and numbness while sitting and that she experienced trauma in July 2009 with the motor vehicle accident.  Plaintiff reported that lying/resting, sitting, twisting, and walking aggravated her symptoms and that applying heat relieved the symptoms.  Plaintiff reported the pain to be at a level nine.  As to her complaints of insomnia, plaintiff reported being unable to fall asleep due to

---

[10]Naprosyn is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis.  <u>Medline Plus</u> (last revised June 15, 2012) <<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html</u>>.

[11]Soma is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.   <u>Medline Plus</u>  (last reviewed Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html</u>>.

twitching of her legs but that Cymbalta[12] provided some relief.
Plaintiff made no complaints of chest pain, irregular heart beat,
palpitations, muscle weakness, or joint and bone symptoms.
Physical examination was unremarkable.  No abnormalities were noted
about the back and spine.  It was noted that plaintiff had normal
range of motion for her age.  Plaintiff was instructed to continue
taking ibuprofen for back ache and to continue with Verapamil,
Cymbalta, Lipitor, and aspirin.  Laboratory testing was ordered.
(Tr. 648-50.)

On July 21, 2010, plaintiff visited Dr. Richard S. Gahn
at Advanced Pain Control, Ltd., with complaints of pain in her low
back, left lower leg, and left hip.  Plaintiff also complained of
problems with her neck, shoulders, and middle back.  Plaintiff
reported that the pain was aggravated by her involvement in a motor
vehicle accident one year prior.  Plaintiff reported having been
administered two steroid injections the previous fall with
transient improvement in her symptoms.  Plaintiff reported the pain
to have gradually returned and worsened.  Plaintiff reported the
pain to worsen with prolonged sitting, standing, bending, and
changing positions from sitting to standing.  Plaintiff reported
that lying down helped her condition.  Plaintiff also reported
intermittent numbness, tingling, and weakness involving the back

---

[12]Cymbalta is used to treat depression and generalized anxiety
disorder, pain and tingling caused by diabetic neuropathy,
fibromyalgia, and ongoing bone or muscle pain such as lower back
pain or osteoarthritis.  Medline Plus (last revised Jan. 15, 2012)
<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

and lower extremities.  Plaintiff's current medications were noted
to include Cymbalta, Celebrex, Flexeril, ibuprofen, and Calan.
Examination of the chest, lungs, and heart yielded normal results.
Neurological examination showed normal deep tendon reflexes.
Examination of the head and neck showed normal range of motion but
with pain.  There was no greater occipital nerve tenderness or
cervical facet tenderness.  Examination of the spine and
extremities showed normal range of motion and no tenderness about
the shoulders.  Range of motion about the elbows was normal.
Plaintiff exhibited pain with range of motion about the lumbar
spine, but no lumbar facet joint tenderness was noted.  No spinous
process tenderness or sacroiliac joint tenderness was noted.
Straight leg raising was painful bilaterally.  Patrick's test and
Gaenslen's test were positive bilaterally.  Sensation and strength
were normal in the upper and lower extremities, bilaterally.
Trigger points were found in the musculature about the cervical,
lumbar, and thoracic spine.  Dr. Gahn noted an MRI of the lumbar
spine to show mild disc degeneration at L5-S1 and a bulging disc at
the same level.  Dr. Gahn noted that an MRI dated August 4, 2009,
likewise showed a bulging disc at L5-S1.  Upon conclusion of the
examination, Dr. Gahn diagnosed plaintiff with nerve root
compression, lumbar; lumbar disc displacement/herniation;
unspecified nerve root and plexus disorder; lumbago; cervical spine
pain; pain in thoracic spine; myalgia and myositis, unspecified;
unspecified musculoskeletal disorders and symptoms referable to

neck; and chronic pain.  Dr. Gahn recommended that plaintiff continue with Dr. Anthony Miller for chiropractic care, continue with her current medications, and undergo steroid injections.  (Tr. 659-62.)  A lumbar epidural steroid injection was administered on July 22, 2010.  (Tr. 663-64.)

Plaintiff returned to Dr. Gahn on August 4, 2010, and reported some improvement in her symptoms.  Plaintiff reported no new numbness, tingling, or weakness.  Another lumbar epidural steroid injection was administered.  (Tr. 664-65.)

Plaintiff returned to Dr. Gahn on August 12, 2010, and reported continued improvement.  Plaintiff complained, however, of continued pain in her left leg and middle back.  Motor sensory examination showed no change.  Straight leg raising was positive on the left.  Deep tendon reflexes were noted to be diminished in the lower extremities but symmetrical.  Examination of the back showed some myofascial tenderness about the rhomboid region.  Another lumbar epidural steroid injection was administered.  (Tr. 666-67.)

On January 6, 2011, plaintiff visited Dr. Gahn and complained of increased pain across the low back toward the left buttock and hip.  Plaintiff also complained of radiating pain into the left leg, calf, and ankle as well as intermittent tingling and numbness in the left calf and ankle.  Plaintiff reported that she had been taking ibuprofen and using Lidoderm patches[13] for the pain.

---

[13]Lidoderm patches are used to relieve the pain of post-herpetic neuralgia.  Meldine Plus (last reviewed Sept. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html>.

Physical examination showed plaintiff's motor sensory exam to be grossly non-focal. Plaintiff was noted to walk with an antalgic gait. Plaintiff could walk on her heels and toes. Straight leg raising was positive on the left. Patrick's test was negative bilaterally. Marked tenderness to deep compression was noted over the sacroiliac joints bilaterally. Dr. Gahn opined that plaintiff's symptoms appeared to be related to sacroiliitis. Sacroiliac joint injections were administered bilaterally. Lidoderm patches were prescribed. (Tr. 667-69.)

### IV. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2012. The ALJ further found that plaintiff had not engaged in substantial gainful activity since December 31, 2007. The ALJ found plaintiff's severe impairments to consist of heart disease and degenerative disc disease at C5-6 and C6-7,[14] but that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff to have the RFC to perform light work except that plaintiff was limited to occasional climbing of stairs and ramps, and occasional stooping, kneeling, and crouching. The ALJ found plaintiff's RFC not to preclude her from performing her past relevant work as a customer service

---

[14]Plaintiff does not challenge the ALJ's finding that plaintiff did not have a severe mental impairment. Nor does plaintiff challenge the ALJ's analysis underlying this finding.

representative, trainer, recruiter, secretary, and receptionist. Inasmuch as the ALJ found plaintiff able to perform her past relevant work, the ALJ determined plaintiff not to be under a disability at any time from December 31, 2007, through the date of the decision.  (Tr. 15-22.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20

- 25 -

C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42
(1987).  The Commissioner begins by deciding whether the claimant
is engaged in substantial gainful activity.  If the claimant is
working, disability benefits are denied.  Next, the Commissioner
decides whether the claimant has a "severe" impairment or
combination of impairments, meaning that which significantly limits
her ability to do basic work activities.  If the claimant's
impairment(s) is not severe, then she is not disabled.  The
Commissioner then determines whether claimant's impairment(s) meets
or equals one of the impairments listed in 20 C.F.R., Subpart P,
Appendix 1.  If claimant's impairment(s) is equivalent to one of
the listed impairments, she is conclusively disabled.  At the
fourth step, the Commissioner establishes whether the claimant can
perform her past relevant work.  If so, the claimant is not
disabled.  Finally, the Commissioner evaluates various factors to
determine whether the claimant is capable of performing any other
work in the economy.  If not, the claimant is declared disabled and
becomes entitled to disability benefits.

          The decision of the Commissioner must be affirmed if it
is supported by substantial evidence on the record as a whole.  42
U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971);
<u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find it adequate to support the conclusion.  <u>Johnson
v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial

- 26 -

evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

   To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

    1. The credibility findings made by the ALJ.

    2. The plaintiff's vocational factors.

    3. The medical evidence from treating and consulting physicians.

    4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

    5. Any corroboration by third parties of the plaintiff's impairments.

    6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ's RFC determination is not based upon some medical evidence of record, and that the ALJ erred at Step 4 of the analysis by relying on testimony of the vocational expert which was not based upon a proper hypothetical question. For the following reasons, plaintiff's argument regarding the ALJ's RFC determination is well taken and this cause should be remanded to the Commissioner for further proceedings.

Residual functional capacity is what a claimant can do despite her limitations. <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, the observations of treating physicians and others, and the claimant's description of her limitations. <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002); <u>Hutsell</u>

v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Dunahoo, 241 F.3d
at 1039 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.
1995)); see also 20 C.F.R. §§ 404.1545(a), 416.945(a)).   A
claimant's RFC is a medical question, however, and some medical
evidence must support the ALJ's RFC determination.   Hutsell, 259
F.3d at 711-12.   The ALJ is "required to consider at least some
supporting evidence from a [medical professional]" and should
therefore obtain medical evidence that addresses the claimant's
ability to function in the workplace.   Id. at 712 (internal
quotation marks and citation omitted).   An ALJ's RFC assessment
which is not properly informed and supported by some medical
evidence in the record cannot stand.   Id.   The burden to prove the
claimant's RFC rests with the claimant and not the Commissioner.
Pearsall, 274 F.3d at 1217.

        In the instant cause, the ALJ determined that plaintiff
had the RFC to "perform light work except limited to only
occasional climbing of stairs and ramps, and only occasional
stooping, kneeling and crouching." (Tr. 19.)   Light work is
defined as work that "requires a good deal of walking or standing,
or . . . involves sitting most of the time with some pushing and
pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b),
416.967(b).   Light work also involves lifting no more than twenty
pounds at a time, with frequent lifting or carrying of objects
weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b).
The ALJ here factually summarized the evidence of plaintiff's

- 29 -

medical examinations and treatment received between April 2008 and July 2009 but did not discuss or examine how such evidence demonstrated that plaintiff could perform light work.  Indeed, the only "discussion" regarding plaintiff's ability to engage in work-related activities appeared to be a cursory reliance on the absence of medical opinions stating that plaintiff could not engage in work-related activities:  "No doctor has stated that the claimant is disabled or that she cannot work.  A record which contains no physician opinion of disability detracts from the claimant's subjective complaints." (Tr. 21.)  An absence of opinion, however, does not constitute medical evidence upon which an ALJ may base his RFC assessment.  See Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001).  "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so[.]" Hutsell, 259 F.3d at 712; see also Lauer, 245 F.3d at 705 (although Commissioner argues that physician never indicated that claimant was unable to engage in work-related activities, physician was never asked to express an opinion about that issue); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) ("In spite of the numerous treatment notes discussed above, not one of [claimant's] doctors was asked to comment on his ability to function in the workplace.").

        In addition, despite numerous treatment records predating

April 2008 from plaintiff's treating physician and therapists detailing plaintiff's continued complaints of and treatment for low back, hip, and leg pain, the ALJ wholly failed to address such evidence.  While an ALJ need not discuss every piece of medical evidence, <u>Wildman v. Astrue</u>, 596 F.3d 959, 966 (8th Cir. 2010), the ALJ's wholesale failure to address such evidence here leaves the Court unable to determine whether it was considered and rejected, and whether any rejection was properly based on substantial evidence.  <u>Jones v. Chater</u>, 65 F.3d 102, 104 (8th Cir. 1995). "Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain evidence.  Accordingly, remand is necessary to fill this void in the record." <u>Id.</u> (internal citation omitted).

Finally, invoking Social Security Ruling 96-6p, the ALJ considered the initial administrative Notice of Disapproved Claims, directed to plaintiff and signed by the Regional Commissioner of the Social Security Administration (Tr. 73-77), to constitute an "expert opinion" on the issue of plaintiff's capabilities and limitations.  (Tr. 21.)  This was error.

Social Security Ruling 96-6p dictates that "[f]indings of fact made by State agency *medical and psychological consultants and other program physicians and psychologists* regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law

- 31 -

judge . . . level[] of administrative review." SSR 96-6p, 1996 WL 362203, at *34467 (Soc. Sec. Admin. July 2, 1996) (emphasis added). "[T]he administrative law judge . . . must consider and evaluate any assessment of the individual's RFC by a State agency *medical or psychological consultant and by other program physicians or psychologists*." Id. at *34468 (emphasis added).

As noted above, the ALJ considered the Notice of Disapproved Claims to be an expert opinion under SSR 96-6p. Although the Notice cursorily states that "[d]octors and other trained staff looked at this case and made this decision[]" (Tr. 74), no findings or RFC assessments by any State agency medical consultant or other program physician are contained within this Notice. There is no basis upon which to consider this letter penned by an agency administrator as an expert opinion under SSR 96-6p.

A review of the record in its entirety, however, shows that a State agency medical consultant, Nancy Dunlap, completed an RFC assessment in May 2008 in which she opined that plaintiff was limited to lifting no more than ten pounds and was limited in her ability to push and/or pull with her lower extremities. Notably, the ALJ's decision is devoid of any mention of Ms. Dunlap's RFC assessment and thus, on its face runs afoul of the dictates of SSR 96-6p. Significantly, Ms. Dunlap's findings are inconsistent with the ALJ's determination that plaintiff could engage in the requirements of light work. Indeed, Ms. Dunlap's RFC assessment

imposes functional limitations more restrictive than those determined by the ALJ. Given the ALJ's failure to acknowledge Ms. Dunlap's RFC assessment, his decision lacks any discussion reconciling the inconsistency between Ms. Dunlap's more restrictive assessment and the ALJ's RFC determination.[15]

For all of the foregoing reasons, the ALJ's determination that plaintiff retained the RFC to engage in light work was not supported by substantial evidence on the record as a whole. This cause should therefore be remanded to the Commissioner for a proper assessment of plaintiff's functional limitations resulting from her impairments, including obtaining information from plaintiff's treating physician and/or therapists, and properly considering expert opinion evidence. Dixon v. Barnhart, 324 F.3d 997, 1003 (8th Cir. 2003); Nevland, 204 F.3d at 858; Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984).

To the extent plaintiff claims that the vocational expert's testimony does not constitute substantial evidence upon which the ALJ could make his adverse decision inasmuch as such testimony was based upon an improper hypothetical question, the undersigned notes, first, that the ALJ made such decision at Step 4 of sequential process by finding that plaintiff could perform her past relevant work. Vocational expert testimony is not required at Step 4 where the claimant retains the burden of proving she cannot

---

[15]Notably, a review of Ms. Dunlap's assessment shows her to have reviewed plaintiff's medical records predating April 2008; the same records which went unmentioned in the ALJ's decision.

perform past relevant work. <u>Lewis v. Barnhart</u>, 353 F.3d 642, 648 (8th Cir. 2003) (citing <u>Banks v. Massanari</u>, 258 F.3d 820, 827 (8th Cir. 2001) (en banc); <u>Gaddis v. Chater</u>, 76 F.3d 893, 896 (8th Cir. 1996); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994)). Nevertheless, as discussed <u>supra</u>, the ALJ's RFC determination was not supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert was based upon the faulty determination of plaintiff's RFC, the vocational expert's answer to that question cannot constitute sufficient evidence that plaintiff was able to engage in substantial gainful employment. <u>Lauer</u>, 245 F.3d at 706.

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole, and the cause should be remanded to the Commissioner for further consideration.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE


Dated this _14th_ day of November, 2012.

- 34 -